# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

———————————————

JAXON PASTORE,

     Plaintiff,

          vs.                                 No. 2:20-CV-913-WJ-GBW

THE BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF CATRON and KENNETH ADAIR

     Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PLEADINGS RELATED TO PLAINTIFF'S SECOND AMENDED COMPLAINT ON THE BASIS OF QUALIFIED IMMUNITY

THIS MATTER comes before the Court upon Defendants' Motion for Partial Summary Judgment on the Pleadings on the basis of Qualified Immunity, filed April 12, 2021 (Doc. 51) (the "Motion"). The Motion seeks summary judgment on the grounds that Plaintiff failed to state any federal claims against the County of Catron or the individual Defendants and that Defendants are entitled to qualified immunity. Having considered the parties' arguments, the applicable law and the record, the Court hereby grants in part and denies in part the Motion in that the Court finds that Plaintiff has three claims with potential merit that will not be dismissed.

## BACKGROUND[1]

Plaintiff in this case is Jaxon Pastore, a retired law enforcement and public safety officer residing in Quemado, New Mexico. Doc. 49 at 3, ¶ 5. Defendants in this case are Kenneth Adair ("Adair") and the Board of County Commissioners for the County of Catron ("County"). Adair is a deputy-sheriff of Catron County. *Id*. at 4, ¶ 8. The County is a political body whose powers are exercised by a board of supervisors responsible for the Catron County Sheriff's Office. *Id*. at 3, ¶ 6.

---

[1] This Memorandum Opinion and Order presents Plaintiff's facts as set forth in the Complaint.

In 2018, Plaintiff purchased for his retirement a remote property in rural Catron County on the west side of Quemado. *Id*. at 4, ¶ 9. The property is fully fenced with "No Trespassing" signs, and is located over twelve miles from public mailboxes. *Id*. To the south of this property, the nearest neighbor is the Sometime Creek Ranch approximately two miles away. *Id*.

In October of 2019, Plaintiff's property suffered a sudden loss of water to ephemeral creeks, causing, *inter alia*, obstruction to the recharging of Plaintiff's well. *Id*., ¶ 10. The loss of water was related to the installation of an artificial channel rerouting Plaintiff's creekwater into an enclosed dam. *Id*. The artificial channel was constructed on public BLM lands a half-mile south of Plaintiff's property by the owners and operators of the Sometime Creek Ranch for the hunting purposes of recreational hunters related to Defendant Adair. *Id*.

On October 11, 2019, Plaintiff visited the Sometime Creek Ranch and spoke with Mary Montierth ("Mrs. Montierth"), wife of Jeran Montierth ("Mr. Montierth") (together, the "Montierths"). *Id*. at 5, ¶ 11. Plaintiff alleges that during this meeting, Mrs. Montierth stated that her husband had made the alteration to the creek and that she would have him fix the issue. *Id*. Defendant Adair's police report states that during this meeting, Mrs. Montierth was afraid of a knife that Plaintiff carried on his hip, and told Plaintiff that she would discuss the issue with Mr. Montierth when he got home because "it was not their intention to deny water from any neighbor." Doc. 28-4 at 4.

Following this meeting, Plaintiff reported suspicious activity on and around his property, to include breaking and entering and rummaging of his belonging. Doc. 49 at 5, ¶ 12. After no correction to the creek by Mr. Montierth, Plaintiff hired an attorney to send a follow-up letter requesting correction of the creek because, according to the Montierth's lease terms, they had no authority to make any alterations on state land. *Id*.

After receipt of the letter from Plaintiff's attorney, the Montierths allegedly drove to Plaintiff's property on November 16, 2019, and informed Plaintiff that the state land belonged to the Montierth ranch and that no action would be taken to fix the alterations to the creek. Doc. 49 at 5, ¶ 14. Plaintiff

informed the Montierths that he would take them to court over the water dispute. *Id*. The police report by Defendant Adair makes different claims as to this meeting. The police report states that this meeting took place on November *14*, 2019. Doc. 28-4 at 4. According to the report, Mr. Montierth reported to Defendant Adair that he and his wife visited Plaintiff, at which time the trio visited the creek on the BLM property and discussed undoing the alteration. *Id*. Mr. Montierth described Plaintiff as combative and accusatory at this time. *Id*.

On November 17, 2019, Plaintiff encountered armed, masked men patrolling an area near his property. Doc. 49 at 6, ¶ 15. Plaintiff reports that this patrolling took place for four consecutive days. *Id*. At one point, these men saw Plaintiff and allegedly chased him through the creek behind Plaintiff's property. *Id*. Plaintiff identified one of the men as Corwin Hulsey ("Hulsey"), an associate of the Sometime Creek Ranch domiciled next to the ranch and responsible for controlling the cattle grazing on the ranch. *Id*., ¶¶ 17-19. Plaintiff also requested information from BLM which revealed that Hulsey leases BLM land directly south of Plaintiff's property. *Id*., ¶ 19. Plaintiff claims that Hulsey is related to Dan Adair, the nephew of Defendant Adair, *id*. at 10-11, ¶¶ 51-53, and that Hulsey is a violent criminal with a record in the area, seemingly in connection with police protection by Defendants Adair and Fletcher. *Id*. at 20-21, ¶¶ 114-16.

Three days later, on November 23, 2019, Plaintiff returned home to find his residence had been entered and rummaged through, and his floor had been urinated on. *Id*. at 6, ¶ 21. The hard-drive to his laptop (containing files about his case against the Montierths) was destroyed and his woodstove was vandalized. *Id*. Plaintiff also reports that his Wi-Fi and game cameras were disabled. *Id*.

According to information received by Plaintiff pursuant to the Inspection of Public Records Act (the "IPRA"), Hulsey, and not the Montierths, contacted Adair (on Adair's personal cell phone) regarding Plaintiff on November 24, 2019. *Id*. at 12, ¶ 62. Documents from the Sheriff's Office confirm that Adair went to Sometime Creek Ranch later that day to meet Hulsey. *Id*. at 12-13, ¶ 65-67.

3

The next day, on November 25, 2019, Plaintiff discovered that his truck had been vandalized either during the late evening or early morning and was unusable. *Id*. at 7, ¶ 22. Later that morning, Defendant Adair appeared on Plaintiff's driveway. *Id*., ¶ 23. Plaintiff was issued a criminal trespass warning which, according to the police report, was because he had frightened Mrs. Montierth during their alleged meeting on November 14, *id*. at 8, ¶ 27; *see* Doc. 28-4 at 4, though Defendant Adair reportedly refused to explain the reason for the warning to Plaintiff, *id*., ¶ 34.

While issuing the trespass warning, Defendant Adair requested Plaintiff's identification. *Id*., ¶ 28. Plaintiff asked permission to enter his home to retrieve the identification, and Defendant Adair followed him inside and allegedly restrained his movements. *Id*. at 9, ¶ 37. George Orona was inside Plaintiff's home installing a new woodstove when Plaintiff was issued the warning. *See id*., ¶ 39; Affidavit of Witness for Plaintiff, Doc. 28-3 at 3, ¶¶ 12-20.

When the warning was issued, Plaintiff was allegedly forced to sign it over his objection. *Id*., ¶ 41. Plaintiff contends that at this time he reported to Defendant Adair the damage to his property and the trespass, and that Defendant Adair responded that it was likely hunters. *Id*., ¶ 43. Plaintiff also reportedly asked Defendant Adair to investigate the damage to his property and to issue a trespass warning to the Montierths as they had done to him, because they too had come onto his property. *Id*., ¶ 45. Defendant Adair reportedly refused to do so because Plaintiff had "no proof." *Id*., ¶ 46.

Plaintiff proceeded to investigate Defendant Adair, the Montierths, and Hulsey, and evidently came across a complex network of relation between these individuals, as well as other individuals with political positions in the County or elsewhere. *See id*. at 10-11. Plaintiff also investigated the activities of Sometime Creek Ranch and those hunting outfits owned by the Adairs, the Montierths and Hulsey. *See id*. at 11-12. Specifically, Plaintiff theorized that the rerouting of his water was done to draw elk in for these outfits, and he notes that the Montierths advertised a hunting business on Facebook, which they have since deleted. *Id*. at 11, ¶ 58.

4

Plaintiff reported his concerns to Catron County Sheriff Fletcher on November 26, 2019, but his requests went unanswered. *Id*. at 14, ¶ 76. On December 5, 2019, Plaintiff notified the Catron County Clerk of a Notice of Claim. *Id*., ¶ 77. Following the notice, Plaintiff reports that assaults on his property increased sharply:

> [H]arassments and assaults on Plaintiff and Plaintiff's property became a daily and nightly occurrence, including multiple attempts to break into Plaintiff's home in the middle of the night while Plaintiff was inside behind barricaded doors. Hulsey and other unknown persons were patrolling around Plaintiff's property on a daily basis, shooting their guns off, and keeping Plaintiff a mere prisoner in his own home and upon his own land.

*Id*., ¶ 78.

On January 14, 2020, two BLM officers and deputy sheriff Michael Bugayong appeared on Plaintiff's property to take a report from Plaintiff in response to emails Plaintiff sent requesting an investigation into the assaults which occurred on *public* land. *Id*. at 15, ¶ 80. Plaintiff claims that during this interchange, the BLM officers refused to take a report on the alleged crimes and instead asked Plaintiff if he was represented by an attorney and which court Plaintiff intended to file his complaint in. *Id*. at 15-16, ¶ 85.

Plaintiff made an IPRA request to the county concerning the BLM officers' visit, and the county responded with video footage in which a BLM officer could be heard saying, "he said it was a red house … they said it was a red house." *Id*. at 16, ¶ 86. Plaintiff theorizes that the "red house" is in reference to Plaintiff's red shop, about which only Adair, the Montierths or Hulsey would have known. *Id*. Plaintiff also complains that Bugayong did not relay any of the information regarding the crimes to the Sheriff's Office. *Id*. at 17, ¶ 95.

On January 15, 2020, Plaintiff received an IPRA response which had been held for thirty-days as "excessively burdensome." *Id*., ¶ 99. The information provided was a full report by Defendant Adair on the details of Plaintiff's trespass warning, which Plaintiff maintains was incorrect and drafted post factum with a fraudulent submission date. *Id*. at 19, ¶¶ 100-06; *see id*. at 22, ¶ 126.

5

Plaintiff also requested Defendant's Adair's and other officers' unrelated police reports for purposes of comparison, and allegedly found that no officers, including Defendant Adair, had never written a criminal report with a separate attached narrative on other criminal trespass warnings or citations except as to Plaintiff. *Id.*, ¶ 108. Plaintiff also notes that what small reports *did* exist as to other individuals were written in the narrative portion of the dated standard report, not separately on a word processing program with no dates. *Id.* at 20, ¶¶ 109-11. These facts and others led Plaintiff to the conclusion that Defendant Adair drafted this report when he was aware that Plaintiff intended to file a lawsuit, *id.*, ¶ 113, so Plaintiff submitted at IPRA request for generation dates of certain documents, *id.* at 21, ¶ 119. This request revealed that the narrative portion of Defendant Adair's police report was generated on December 19, 2019, nearly a month after the incident in violation of the Sheriff's Office report requirements, and not completed until December 31, 2019. *Id.* at 22, ¶ 123. If true, the report was not submitted in November, as claimed by Defendants, and indicate that Sheriff Fletcher signed the police report knowing, at the very least, that the date of the report was incorrect.[2]

## LAW

### I.      Standard of Review

Under Rule 12(b)(6), the Court reviews Plaintiff's allegations for plausibility. Specifically, the Court queries whether enough facts have been pled to state a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007). The "plaintiff must plead that each Government-official defendant, through his own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1948, 173 L.Ed.2d 868 (2009).

In reviewing the plausibility of a complaint, the Court must assume the truth of all well-pled facts in the complaint, and draws reasonable inferences therefrom in the light most favorable to the Plaintiff. *See Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009); *Ashcroft*,

---

[2] According to Plaintiff, the report-writing policy of the Sheriff's Office is that all reports shall be submitted by deputies within 48 hours, and all supplemental reports within 24 hours. Doc. 49 at 23, ¶ 113.

129 S.Ct. at 1949.

In addition, "[t]he court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted" under Rule 8(a)(2). *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal quotations and citations omitted), cert. denied, 130 S.Ct. 1142 (2010).

The Supreme Court has clarified the Rule 12 standard, stating that "to withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Id.* at 1247 (quoting *Twombly*, 550 U.S. at 570). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, so that "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Under this standard, "a plaintiff must nudge his claims across the line from conceivable to plausible in order to survive a motion to dismiss." *Smith*, 561 F.3d at 1098. Therefore, a plaintiff must "frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 556).

## II.    42 U.S.C. § 1983

To state a claim under § 1983, a plaintiff must allege the violation of a constitutional right, and must show that the deprivation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). "Acting under color of state law" requires that a defendant in a § 1983 action have exercised actual or apparent authority possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. *Id.*, 487 U.S. at 49; *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995). Individual defendants may be held liable to the extent they knew, or reasonably should have known, that their alleged conduct would lead to the deprivation of constitutional rights. *See Martinez v. Carson*, 697

F.3d 1252, 1255 (10th Cir. 2012) ("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.") (citations omitted). Supervisors are liable under § 1983 where there is an affirmative link between the alleged constitutional deprivation and the supervisor's personal participation, exercise of control, or failure to supervise. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (citing *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)). Supervisory liability requires a showing that such policies were a "deliberate or conscious choice." *Barney v. Pulsipher*, 143 F.3d at 1307–08 (citations omitted) (internal quotations omitted); *Ashcroft*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

### III.    Qualified Immunity

The doctrine of qualified immunity protects officials from civil liability as long as they do not "'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). To defeat this immunity, we require the plaintiff to show that

• the defendant violated a constitutional or statutory right; and

• the violated right was "'clearly established at the time of the alleged unlawful activity.'"

*Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018) (bullet points in original). These two elements are commonly referred to as the two prongs of a qualified immunity test.

Once "a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to that immunity." *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005); *see also Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) (noting that district court decisions which place the burden on the defendant-movant of establishing qualified immunity constitute error). *Matthews* explains that, under the qualified immunity analysis, the

conduct of each individual capacity defendant must be isolated and analyzed, as opposed to an analysis of the defendants' conduct cumulatively. *Id*. at 1145.

Regarding the clearly established law prong of a qualified immunity test, courts must not define the relevant constitutional right "at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Instead, as the Supreme Court "explained decades ago, the clearly established law must be 'particularized' to the facts of the case." *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## DISCUSSION

The Complaint lists the following causes of action:

### State Tort Claims Act[3]

1. Trespass under Article II, § 10 of the New Mexico State Constitution
2. False Imprisonment under Article II, § 10 of the New Mexico State Constitution
3. Defamation, Libel Per Se
4. Intentional Infliction of Emotional Distress
5. Negligence Per Se under N.M. Stat. § 29-1-1
6. Deprivation of Rights under N. M. Stat. § 4-41-2
7. Violation of Equal Protection under Article II, Section 18 of the New Mexico State Constitution

### Federal Claims under 42 U.S.C. § 1983

1. Failure to Train and Supervise against County
2. Unreasonable Seizure under the Fourth Amendment of the United States Constitution against Defendant Adair
3. Violation of Equal Protection under the Fourteenth Amendment of the United States Constitution against all Defendants
4. Conspiracy to Deprive Substantive Due Process under the Fourteenth Amendment of the United States Constitution against all Defendants

---

[3] All of the Tort Claims Act claims are alleged against all Defendants.

5. Retaliation under the First and Fourth Amendments of the United States Constitution against all Defendants

Defendants' Motion asks the Court to dismiss all federal claims against all Defendants.

## I.    Plaintiff's Pro Se Status

As a preliminary matter, the Court notes that Plaintiff brings the subject Complaint pro se. The Court is therefore required to construe his pleadings liberally so long as the Court does not fashion legal arguments or supply additional factual allegations on his behalf. *See Xiong v. McCormick*, 809 Fed. Appx. 496, 498 n.1 (10th Cir. 2020) ("Because [the plaintiff] is proceeding pro se, we liberally construe his filings. That said, liberally construing a pro se filing does not include supplying additional factual allegations or constructing a legal theory on the appellant's behalf.") (citing *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009)); *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997)).

## II.    Plaintiff's Official Capacity Claims Against Individual Defendants

Defendants' first argument is that NMSA § 4-46-1 and Federal Rule 17 preclude Plaintiff's official capacity claims against Defendant Adair because official-capacity suits are effectively just another way to plead an action against an entity of which an officer is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985); *see also Torres v. Shea*, 2020 WL 1676920, at *4 (D.N.M. Apr. 6, 2020). Plaintiff concedes that because he has properly named Defendant County, his official capacity claims against Defendant Adair are redundant and should be dismissed. The Court thus dismisses Plaintiff's § 1983 claims against Defendant Adair in his official capacity.

## III.    Improper Training and Supervision

The Complaint alleges that the County violated its duty to provide appropriate and adequate hiring, training and supervision for its law enforcement personnel. Specifically, Plaintiff claims that the County negligently and with deliberate indifference hired law enforcement personnel with a

propensity for criminality, that it failed to train such personnel, and that it knew or should have known that such practices would result in the deprivation of the rights of citizens. Plaintiff also alleges that the County failed to implement a system of accountability, a failure which ultimately led to unconstitutional behavior by subordinate employees.

The Supreme Court found in *Monell v. Dep't of Soc. Servs.* that local governing bodies and officials can be sued directly under § 1983. 436 U.S. 658, 98 S. Ct. 2018 (1978). Such claims are commonly referred to as *Monell* claims. Defendants argue here that the Complaint fails to plead a plausible *Monell* claim against the County, as Plaintiff "never identifies *precisely* what particular custom or policy [of the County that the Defendant's Fletcher[4] or Adair were] acting pursuant to …." Doc. 51 at 11 (quoting *Abila*, 2016 WL 9021834, at *18) (emphasis in original).

Plaintiff contends that Defendants' argument is unavailing for two reasons: (1) Plaintiff is not alleging that the injuries occurred merely as a result of an official policy, but rather, as a result of willful constitutional violative practices undertaken by the County, and (2), notwithstanding, Plaintiff has met his burden through complaints filed with the County, complaints which he contends were deliberately ignored as to prejudice his ability to seek relief for false reports, conspiracy, retaliation and failure to act by the County and its agents.

As to negligent hiring and training, Plaintiff offers nothing but conclusory allegations. Plaintiff effectively assumes that the County failed to investigate Defendant Adair's background and failed to train him simply by virtue of the fact that Defendant Adair acted in violation of Plaintiff's constitutional rights. Plaintiff alleges no facts relating to the actual hiring practices employed by the County or to their training procedures, and therefore, those portions of the Complaint seeking § 1983 coverage on the grounds of inadequate hiring and training have no basis in the law.

However, as to negligent supervision, Plaintiff alleges the following:

---

[4] This quote predates the voluntary dismissal of claims against Sheriff Fletcher by Plaintiff. *See* Doc. 58.

- Defendants did not implement a system for independent review of complaints for the purpose of insulating the Sheriff's Office from unbiased investigation of deputy conduct.  *See id.*, ¶ 191.[5]

- Defendants did not safeguard evidentiary documents because they failed to provide software to deputies that prohibited police reports from being altered or fraudulently generated after the fact. *See* Doc. 49 at 31, ¶ 190.

- Sheriff Fletcher knowingly signed a police report with an incorrect date so Defendant Adair could file a fraudulent report and protect other individuals from investigation while they regularly assaulted Plaintiff and his property. *See id.*, ¶¶ 102-106, 118-128, 130-132.

The first of these claims, while pleaded correctly, indicates no unconstitutional conduct on behalf of the County. The second claim fails for the same reason—Plaintiff identifies no feature of the Constitution requiring a sheriff's office to implement technological systems that prevent production of post-factum police reports, and the Court is unable to find any such precedent. However, the third claim is sufficient to form the basis of a § 1983 action against the County.

In *Specht v. Jensen*, the Tenth Circuit found that once an "affirmative link" exists between a deprivation of rights and either the supervisor's "personal participation, his exercise of control or direction, or his failure to supervise," they may be held liable under § 1983. 832 F.2d 1516, 1524 (10th Cir. 1988). According to the *Jensen* court, liability sticks when a person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes a deprivation." *Id.*  Under Plaintiff's version of the facts, Sheriff Fletcher's knowing approval of the fraudulent police report with the fraudulent date, resulting in the uninvestigated and continued property damage perpetrated by family members of Defendant Adair and Defendant Adair himself, satisfies *Specht*. However, Plaintiff has dismissed his claims against Sheriff Fletcher, and the

---

[5] The specific factual support for this allegation is as follows: Plaintiff reported Defendant Adair's misconduct to Sheriff Fletcher via email, and the email was ignored. Doc. 49 at 14, ¶ 76. Incidents and severity of assaults on Plaintiff's property increased exponentially following notification by Plaintiff to the Catron County Clerk of his intention to file a claim against the County. *Id.*, ¶¶ 77-78.

County is the only remaining party that may be liable for the improper supervision of Defendant Adair under a theory of municipal liability.

There are generally three requirements for municipal liability under § 1983: (1) the existence of an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury; and (3) that the defendant established the policy with deliberate indifference to an almost inevitable constitutional injury. *Dawson v. Bd. of County Comm'rs*, 732 Fed. Appx. 624, 628 (10th Cir. 2018). However, where a *single* decision results in a constitutional violation, municipal liability may attach where the decisionmaker has "final authority" to establish municipal policy with respect to the single act. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Here, Plaintiff pleads that "Fletcher was the commanding officer of operations within the Sheriff's Office, and he was responsible for the training, suspension, hiring, supervising, and conduct of Defendant[ Adair] … enforcing the regulations of the Sheriff's Office, and for ensuring that his deputies obey the laws of the State of New Mexico and the United States." Doc. 49 at 3-4, ¶ 7. While not completely clear, Plaintiff appears to plead that Sheriff Fletcher was a decisionmaker for the County, at least with respect to supervision and deputy conduct. This alone may be enough to find that Sheriff Fletcher was the policymaker with authority "to establish municipal policy" with regard to the filing of police reports, and that he "sanctioned or ordered" Defendant Adair's fraudulent police report by signing it with an incorrect date to hide the fact that it was edited later by Defendant Adair. *Pembaur*, 475 U.S. at 469; *Buck v. City of Albuquerque*, 2007 U.S. Dist. LEXIS 116623, at *17 (D.N.M. 2007); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) ("A municipal policy or custom may take the form of: … the ratification by [ ] final policy-makers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval ….").

The Seventh Circuit has articulated a rule very applicable to the facts here:

> It doesn't matter what form the action of the responsible authority that injures the plaintiff takes. It might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff). The question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—*was at the apex of authority for the action in question.*

*Gernetzke v. Kenosha Unified School Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) (emphasis added). Sheriff Fletcher, at least consistent with the Plaintiff's allegations, would certainly have been the apex of authority for the approval of police reports in the Sheriff's Office, as he was the county sheriff and the individual charged with signing off on such reports. Thus, Sheriff Fletcher's knowingly signing a fraudulent report can be attributed to the County, and where the report resulted in a constitutional injury, the nexus for municipal liability is satisfied. *See id.*; *see also Randle*, 69 F.3d at 447 ("Municipal liability arises even if the official's decision is specific to a particular situation.").

Because Defendants have motioned for relief based on qualified immunity, the Court must next determine whether Sheriff Fletcher's signing of the fraudulent police report resulted in a violation of constitutional or statutory rights that were "clearly established at the time of the alleged unlawful activity." *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018); *Luna*, 136 S.Ct. at 308 ("The doctrine of qualified immunity protects officials from civil liability as long as they do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

Plaintiff specifically alleges that Sheriff Fletcher fraudulently signed one such backdated police report for purposes of hiding Defendant Adair's post-factum modification. Plaintiff further alleges that this protection by Sheriff Fletcher was to "overt[ly] encourage" further assaults on Plaintiff's property and hide Plaintiff's allegations about the individuals harassing Plaintiff, insulating them and Defendant Adair from investigation. *See* Doc. 49, ¶¶ 136, 55 ("They allow for Adair's family and friends to terrorize, threaten, harass, intimidate, and bully innocent persons such as Plaintiff, while hiding behind, and protected by, State power."). Section 1983 also imposes liability on a government official who "causes to be subjected, any citizen … to the deprivation of any right,"

14

regardless of whether it was "other people [who] may have concurrently caused the harm…." 42 U.S.C. § 1983; *Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006); *see also Carson*, 697 F.3d at 1255 ("The requisite causal connection is satisfied if [Defendant] set in motion a series of events that [Defendant] knew or reasonably should have known would cause others to deprive [Plaintiff] of [his] constitutional rights.") (citing *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)) (internal quotations omitted). According to Plaintiff, it was Sheriff Fletcher's signature and the contents of Defendant Adair's falsified police report that "encourage[d]" associates and even relatives of Defendant Adair to break into Plaintiff's home, Doc. 49, ¶¶ 136, 87, 12, assault Plaintiff, *id.*, ¶¶ 87, 16, urinate on Plaintiff's floor, and vandalize Plaintiff's computer, woodstove, and truck, *id.*, ¶¶ 21-22. Even if Sheriff Fletcher was not aware that his signature would result in the violation of Plaintiff's property rights specifically, as opposed to some other form of harassment or retaliation, his decision to approve the falsified report was at least deliberate indifference, as Plaintiff argues. *Id.*, ¶ 6. There is no reason to belabor a deliberate indifference analysis here. If Sheriff Fletcher, as Plaintiff has alleged, knowingly signed falsified documents, *id.*, ¶ 98, for the purposes of mischaracterizing Plaintiff and hiding his complaints as to "overt[ly] encourage" further destruction of Plaintiff's property and protect Hulsey, *id.*, ¶¶ 136, 101-06, 114-17, 125-26, 127, 131-33, then Sheriff Fletcher's supervisory conduct as a policymaker far exceeds deliberate indifference. Accordingly, taken as true, Plaintiff's allegations support and inference that the County, vis-a-vis Sheriff Fletcher, as well as Defendant Adair acting under the color of law, knowingly set into motion a series of events that ultimately resulted in the deprivation of Plaintiff's property rights. *See id.*, ¶ 140; *Id.* at 33, ¶ 212.

The next step is identifying which constitutional rights were violated, and whether they were recognized at the time of the violation of said rights. Here, as the Court has stated, Plaintiff's established property rights were clearly violated if his truck and personal belongings were destroyed by Hulsey or Defendant Adair as a result of the sheriff's encouragement. *See United States v. Tueller*, 349 F.3d 1239 (10th Cir. 2003) (acknowledging that unnecessary destruction of property by a police

officer is unconstitutional under the Fourth Amendment); *Lowther v. United States*, 480 F.2d 1031 (10th Cir. 1973) (finding law enforcement's destruction of property without authority to do so is contrary to the Due Process Clause); *United States v. Ramirez*, 523 U.S. 65 (1998) (acknowledging limits on a police officer's ability to destroy property while executing a warrant).  Furthermore, Plaintiff has pled facts sufficient to infer that other constitutional rights were violated merely as a result of the fraudulent police report. *See Lynch v. Barrett*, 2012 WL 1944553, 2012 U.S. Dist. LEXIS 72250, at *7 (D. Colo. 2012) (finding that "intentional concealment of evidence by a police officer" is unconstitutional, and that it "would be clear to a reasonable police officer that intentional concealment of evidence of another officer's misconduct, the so-called conspiracy of silence, is unlawful.") (citing *Donohue v. Hoey*, 109 F. App'x 340, 356 (10th Cir. 2004) (unpublished) (abrogated on other grounds)); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1207-08 (10th Cir. 2007)) (abrogated on other grounds)). There is no doubt to the Court that if Sheriff Fletcher knowingly signed a fraudulent police report to encourage destruction of Plaintiff's property and to shield the perpetrators from investigation, he was on notice as to the probable constitutional violations that would stem from his conduct. Accordingly, assuming Plaintiff's allegations are true, the County vis-à-vis Sheriff Fletcher "set in motion a series of events that [Sheriff Fletcher] knew or reasonably should have known would cause others to deprive [Plaintiff] of [his] constitutional rights." *Carson*, 697 F.3d at 1255. Plaintiff has therefore established municipal liability, met his burden as to qualified immunity, and pled facts that defeat Defendants' motion for judgment on the pleadings as to this cause of action.

### IV.   Unlawful Seizure

Plaintiff next argues that Defendant Adair violated Plaintiff's Fourth Amendment rights against unreasonable seizure by intruding on Plaintiff's land, seizing Plaintiff's ability to move about freely, entering and remaining inside of Plaintiff's home, and issuing a criminal citation to Plaintiff without any recognized lawful authority to do so. Doc. 48-49, ¶¶ 194-96. Defendants respond that

Plaintiff did not object when Defendant Adair entered his home, and that he was not charged criminally for trespass without probable cause, but that Defendant was given a trespass *warning*, which "is simply a formal notification that the owner or occupant of a certain property has withdrawn his or her consent for the recipient to enter or remain upon their land." Doc. 51 at 17.

As to Defendant Adair's entry into Plaintiff's home, Plaintiff has failed to establish that Defendant Adair violated any clearly established law. Plaintiff does not plead that he refused Defendant Adair entry into the home, and, as Defendants rightfully note, it is generally legal for law enforcement to enter a private property to talk. See *U.S. v. Carloss*, 818 F.3d 988 (10th Cir. 2016); *see also Rieck v. Jensen*, 651 F.3d 1188, 1189, 1191–94 (10th Cir. 2011). Plaintiff claims to have felt threatened and powerless, but absent any affirmative action on his part indicating that Defendant Adair was not welcome into the home, these claims do not raise to the level of an unlawful entry and Defendant Adair is entitled to qualified immunity on Plaintiff's claim of unlawful seizure.

**V.     Equal Protection**

Plaintiff next argues that Defendant Adair and the County violated Plaintiff's rights to equal protection by refusing to perform their duties, intentionally depriving Plaintiff of evidence necessary for a civil suit against the Montierths, and intentionally obstructing Plaintiff's ability to obtain justice both criminally and civilly for the harassment which Plaintiff alleges took place on his property. Defendants respond that Plaintiff fails to allege facts sufficient to support such a claim, and rather, that Plaintiff merely alleged the legal standard as though it was a set of supporting facts.

Having reviewed the Complaint in this matter, the Court is not convinced that Plaintiff merely restated the legal standards for an equal protection cause of action. Plaintiff clearly alleges specific acts undertaken by Defendant Adair and Sheriff Fletcher, acts sufficient to infer a violation of equal protection. For instance, Plaintiff alleges that he reported assaults and property damage to both Defendant Adair and Sheriff Fletcher, and that both Defendant Adair and Sheriff Fletcher not only failed to investigate, but took affirmative steps to undermine Plaintiff and protect the individuals

responsible for the assaults and property damage. Plaintiff supports this argument with evidence that Defendant Fletcher did indeed draft Plaintiff's police report post-factum, in violation of the County's reporting policies, and did not do so for other individuals' police reports.

However, Plaintiff does not bring this cause of action under a traditional discrimination theory. Because Plaintiff alleges that the County and Defendant Adair's conduct constitutes unfair treatment of Plaintiff as compared to *everyone* else, instead of just individuals with a different[sex, age or race, his claim is known as a "class of one" equal protection claim. The question thus becomes: do the facts alleged by Plaintiff meet the burden for a "class of one" equal protection claim? In the context of a motion to dismiss, the answer is yes.

In the Tenth Circuit, a plaintiff bringing a "class of one" equal protection claim must demonstrate that others "similarly situated in all material respects" were treated differently. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1217 (10th Cir. 2011). As Defendants note*, Jennings v. City of Stillwater* explains the Tenth Circuit's reasoning for the standard, and the case presents somewhat similar facts. 383 F.3d 1199, 1213-1214 (10th Cir. 2004). In *Jennings*, the plaintiff claimed that too few resources were devoted to her case in violation of her rights to equal protection. *Id*. The Tenth Circuit ultimately found that the plaintiff failed to meet her burden of "provid[ing] a detailed account of the nature of the preferred treatment of the favored class," and that the "multiplicity of relevant (nondiscriminatory) variables" made it difficult for Plaintiff to demonstrate discrimination where she failed to "provide compelling evidence of other similarly situated persons who were in fact treated differently." *Id*. at 1214.

What Defendants fail to acknowledge is that Plaintiff plead specific facts on this issue, and that the case is distinct from *Jennings* insofar as Plaintiff alleges that Defendant Adair and Sheriff Fletcher took *deliberate* steps to undermine the investigation of Defendant Adair's relatives who were assaulting Plaintiff and destroying his property. For example, Plaintiff took great strides to request police reports from the Sheriff's Office against which to compare his own allegedly fraudulent report,

and alleges that the reports for other individuals were not detailed and targeted, seemingly distinguishing them from other police reports which were not filed with a fraudulent date.[6] Because Plaintiff's claims in part revolve around his allegation that Defendant Adair and Sheriff Fletcher tailored a lengthy, fraudulent report for purposes of undermining Plaintiff and protecting other individuals from potential investigation for property crimes, Plaintiff's allegation that his report was treated differently from others is enough to state an equal protection claim and relates directly to the constitutional injuries which Plaintiff alleges. As stated above, Plaintiff has sufficiently plead a violation of recognized constitutional property rights which were caused by Defendant Adair and Sheriff Fletcher's allegedly selective reporting and investigatory practices, and with the facts alleged, Plaintiff has met his burden as to his "class of one" equal protection claim.

**VI.     Retaliation**

Plaintiff next argues that Defendants retaliated against him in violation of the First Amendment when he expressed his intent to file a lawsuit against Defendant Adair. In support of this argument, Plaintiff claims that in response to his threat of legal action, (1) the County refused to grant Plaintiff's public records requests, and (2) Defendant Adair and Sheriff Fletcher conspired to file a fraudulent police report undermining Plaintiff and his complaints as to property damage and assault.

First, it is clear that there is no constitutionally protected right to obtain public records, though disclosure of records may be compelled by statute. *See, e.g, McBurney v. Young*, 569 U.S. 221 (2013); *see also Newsome v. The GEO Group, Inc.*, 2013 WL 12329116 (D.N.M. Sept. 24, 2013). Moreover, even if Defendant Adair or Sheriff Fletcher instructed the administrative employees of the Sheriff's

---

[6] Plaintiff also alleges that Defendant Adair treated Plaintiff differently in the course of his investigation of Plaintiff. Specifically, Plaintiff alleges that he issued a trespass warning to Plaintiff without proof and based merely on unsupported statements by the Montierths. As Plaintiff alleges, when Plaintiff requested that an identical trespass warning be issued to the Montierths, who also came on Plaintiffs land, Defendant Adair refused because there was "no proof," in violation of N.M. Stat. § 29-1-1 and N.M Stat. § 4-41-2. Doc. 49 at 10, ¶ 46. This occurred prior to the bulk of the assaults on Plaintiff and his property and does not clearly indicate Defendant Adair's conduct as to all other individuals, but this does support Plaintiff's argument that he was arbitrarily treated differently than the identically situated Montierths from very early on in the investigation.

Office to delay or deny Plaintiff's requests, Plaintiff does not allege that such denial resulted in the assaults or property damage allegedly perpetrated by Defendant Adair or his relatives or insulated Defendant Adair or his relatives from investigation. It could be argued that the refusal to grant Plaintiff's IPRA requests emboldened further acts by the assailants, but the alleged facts are not strong enough to support an inference to this effect. Accordingly, Plaintiff does not allege an established constitutional injury resulting from the denial of his IPRA requests, and thus the County and Defendant Adair are entitled to qualified immunity on this claim.

Second, the contents of the fraudulent report, though they did result in a constitutional injury, do not support a retaliation claim. To prevail on a First Amendment retaliation claim, a plaintiff must establish:

(1) that the plaintiff was engaged in constitutionally protected activity;
(2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and
(3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citing Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)). The first and second *Shero* requirements are satisfied. Plaintiff obviously has an established constitutional right to express his desire to pursue a lawsuit, and to do so. *See Craft v. Middleton*, 2012 U.S. Dist. LEXIS 130945, at *2 (W.D.Ok. 2012) (Plaintiff enjoys a federal constitutional right to file a lawsuit.") (citing *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)). And as explained above, Plaintiff's factual allegations are sufficient for a jury to find that the fraudulent police report was meant to undermine Plaintiff's reported version of the dispute between Plaintiff and the Montierths and to protect Defendant Adair and his family members from investigation for assault and destruction of property. Constant harassment, assaults and property damage seemingly condoned by the Sheriff's Office is, without a doubt, enough to chill a person of ordinary firmness from pursuing a lawsuit.

However, the third *Shero* requirement is not satisfied. Plaintiff submitted his Notice of Claim expressing his intent to pursue a lawsuit against Defendant Adair on December 5, 2019. Doc. 49 at 34, ¶ 221. The police report showed a false submission date of November 24, and the investigation on which the police report was based took place on November 24. It appears from the Complaint that the police report accordingly should have been filed on or shortly after November 24,[7] but it wasn't. This means that Defendant Adair's decision to falsify the report occurred on or around November 24, though it wasn't until December 5 that Plaintiff notified the Sheriffs Office of his intention to file suit against Defendant Adair. Therefore, though the increase in assaults on Plaintiff's property can likely be attributed to Plaintiff's Notice of Claim, the decision to falsify the report predated the Notice of Claim and it cannot be argued that the falsified report was made in response to the Notice of Claim. Therefore, Plaintiff has not met the third *Shero* requirement, and his retaliation claim related to the fraudulent report accordingly fails.

## VII.   Conspiracy

Plaintiff argues that Defendant Adair and the County conspired with the Montierths and family members of Defendant Adair to deprive Plaintiff of his substantive due process rights. In support of his argument, Plaintiff alleges facts which, if true, are very suspicious:

- Plaintiff approached the Montierths over the unlawful redirection of Plaintiff's sources of water. Doc. 49, ¶ 11.
- The Montierths redirected the water to draw elk for the Montierths' hunting guide outfit and for the hunting guide outfits of Montierths' associates, who were known and related to Defendant Adair. *Id*., ¶¶ 10, 51-53, 56, 58-60.
- After Plaintiff initially approached the Montierths, his home was broken into, his floor was urinated on, he was assaulted by Corwin Hulsey—a relative of Defendant Adair's—and other masked individuals, his laptop was vandalized, his vehicle-repair tools were stolen, and his truck chassis and tire were punctured by Defendant Adair

---

[7] According to Plaintiff, Sheriff Fletcher backdated his signature to November 26, 2019, so the Court assumes that such reports are generally filed within a few days of the reported incident. Doc. 49 at 19, ¶ 106. Further, according to Plaintiff, the Sheriff's Office reporting protocol required a report to be submitted within 48 hours of taking the report, and that supplemental reports must be filed within 24 hours. *Id*. at 23, ¶ 133. That Defendant Adair did not file the report and waited until much later to draft and submit the report indicates a decision by Defendant Adair to deviate from reporting protocol on or around November 24-26, 2019.

when he visited Plaintiff to issue a trespass warning. *Id.*, ¶¶ 12, 15-19, 21-24, 53, 67, 75.

- IPRA documents revealed that it was Hulsey, not the Montierths, who contacted Defendant Adair regarding Plaintiff. *Id.*, ¶ 62.
- Prior to visiting Plaintiff's property, Defendant Adair met with Hulsey at the Montierths' property, where Plaintiff alleges that Defendant Adair and Hulsey devised a plan to intimidate Plaintiff in response to the water-rights dispute between Plaintiff and the Montierths. *Id.*, ¶¶ 66, 72.
- When Defendant Adair went to Plaintiff's property after this meeting, he issued Plaintiff a trespass warning based on unsupported claims allegedly made by the Montierths, then refused to issue a trespass warning to the Montierths under identical circumstances. *See id.*, ¶ 46.
- Adair reported the vandalism and theft on his property, and requested that Defendant Adair investigate and collect evidence. *Id.*, ¶ 44. Defendant Adair attributed the assaults to "hunters," when, according to Plaintiff, he and his associates were truly responsible. This information was not accurately disclosed in the police report later filed by Defendant Adair with a fraudulent date. *Id.*, ¶¶ 99-106, 118-127, 130-131, 133.
- The report, signed by Sheriff Fletcher knowing that the report was fraudulently backdated, contained false dates, incorrectly recited Plaintiff's statements, and incorrectly stated that the underlying conversations about the trespass warning were with the Montierths, who were allegedly in Arizona, not Hulsey. *Id.*, ¶¶ 69-70, 74.
- Defendant notified Sheriff Fletcher of the assaults and property damage, but was ignored. *Id.*, ¶ 76.
- On December 5, 2019, Plaintiff notified the County that he intended to file suit. Immediately following this message, trespass, harassment and property damage increased significantly on Plaintiff's land. *Id.*, ¶¶ 77-78.

Under Tenth Circuit law, a § 1983 conspiracy claim "requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010). Plaintiffs allegations clearly point to more than two individuals within the Sheriff's Office, one being the sheriff himself and direct supervisor to Defendant Adair.

Plaintiff also alleges that private actors were involved in the conspiracy, and a § 1983 conspiracy claim may arise when a private actor conspires with a state actor, acting under the color of state law, to deprive an individual of a constitutional right. *Dixon v. Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990) (citing *Dennis v. Sparks*, 449 U.S. 24, 29, 66 L. Ed. 2d 185, 101 S. Ct. 183 (1980);

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 149-152, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)). The conspiracy itself, involving state actors, provides the requisite color of state law. *Id.*

Regardless of whether Defendant Adair or Sheriff Fletcher were personally involved in the property destruction, a conspiracy claim allows for imputed liability provided there is an underlying constitutional deprivation. *Dixon*, 898 F.2d at 1449 n.6 (citing *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980); *Ryland v. Shapiro*, 708 F.2d 967, 974 (5th Cir. 1983)). In other words, Plaintiff may impose liability on Defendant Adair and the County for the actions of Hulsey performed in the course of a conspiracy. *Id.*

While Plaintiff's alleged facts certainly do not paint a complete picture of the alleged conspiracy, such facts, if true, are more than sufficient to support an inference of conspiracy to deprive. *See Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir.1980) (finding that direct evidence of a conspiracy is rarely available, and "the existence of a conspiracy must usually be inferred from the circumstances") (citing *Loew's, Inc. v. Cinema Amusements*, 210 F.2d 86, 93 (10th Cir. 1954)). Such facts support an inference that Defendant Adair, his relatives, Sheriff Fletcher, and potentially others, conspired to assault and vandalize Plaintiff's property and to protect the culprits of the assaults on Plaintiff's property from investigation as to dissuade Plaintiff from filing suit against Defendant Adair or the Montierths. As discussed above, the actions allegedly undertaken by Defendant Adair and the County resulted in the deprivation of Plaintiff's obvious constitutional rights, and Defendants motion for judgment on the pleadings as to Plaintiff's conspiracy to deprive cause of action fails.

## CONCLUSION

On a motion for judgment on the pleadings based on qualified immunity, the Court must assume Plaintiff's alleged facts are true. Assuming the facts set forth in the Complaint are true, Plaintiff has sufficiently pled improper supervision, equal protection, and conspiracy to deprive claims under § 1983. His constitutional injuries were established at the time of their occurrence, as his rights to protection from state destruction of property and to file a lawsuit are clear, and there is

no dispute that Defendant Adair, or Sheriff Fletcher acting as a policymaker to the County, acted under the color of state law. For these reasons, and those otherwise set forth in this Memorandum Opinion and Order, Defendants' Motion for Partial Judgment on the Pleadings Related to Plaintiff's Second Amended Complaint on the Basis of Qualified Immunity (Doc. 51) is hereby **DENIED** as to Plaintiffs improper supervision, equal protection and conspiracy to deprive claims, and hereby **GRANTED** as to Plaintiff's unreasonable seizure and retaliation claims.

This is a civil rights case involving complex legal concepts. Therefore, while Plaintiff certainly has the right to represent himself in this matter, the Court strongly recommends that he seek legal representation moving forward. Should Plaintiff decide to seek such representation, the Court would be inclined to look favorably upon a formal request by Plaintiff to stay this case for a limited period of time to allow Plaintiff to do so. Plaintiff must file such formal request with the Court within fourteen (14) days of the entry of this order. If Plaintiff chooses to proceed pro se, the Court notifies Plaintiff that the Court cannot give advice on how to prosecute a case. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[I]t is [not] the proper function of the district court to assume the role of advocate for the pro se litigant.").

**IT IS SO ORDERED.**

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE